**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| DIONNE DIXON, | ) | |
| TONYA FORTUNE, and | ) | |
| WANDA DALLAS, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| R. DAVID WARE, in his | ) | |
| individual capacity,  and  FULTON | ) | |
| COUNTY, GEORGIA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Dionne Dixon, Tonya Fortune, and Wanda Dallas respectfully submit the following Complaint against Defendants R. David Ware, in his individual capacity, and Fulton County, Georgia.

## INTRODUCTION

1.      Defendant R. David Ware is the Fulton County Attorney.  As the County's chief legal officer, Ware is charged with representing the County against employees who allege violations of the federal civil rights laws and advising the County Commission and other County officials on compliance with those laws. For several years prior to the filing of this lawsuit, Ware used the position and

1

authority of his office to engage in a pattern and practice of sexually harassing his female subordinates and retaliating against them when they rejected his sexual advances.  The Plaintiffs are three women whom Ware subjected to repeated unwanted sexual advances, who rejected these advances, and against whom Ware retaliated.  Plaintiffs bring claims of sexual harassment against both Defendants under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Plaintiffs seek declaratory and injunctive relief, damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

2.     Plaintiffs' claims under Fourteenth Amendment, which are actionable under 42 U.S.C. § 1983, present federal questions over which the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

3.     This Court is a proper venue for Plaintiffs' claims under 28 U.S.C. § 1391(b), because one or more of the Defendants reside in the Northern District of Georgia and because the unlawful conduct giving rise to the claims occurred in this District.

4.     Plaintiff Dixon has timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC")'s Atlanta District Office.  The charge is pending with the EEOC as of the filing of this

Complaint.  Within 90 days of receiving a Notice of Right to Sue, Dixon will seek

leave to amend the Complaint to add her Title VII claims.

## THE PARTIES

5.     All Plaintiffs voluntarily subject themselves to this Court's

jurisdiction.

6.     Defendant Ware is a resident of the Northern District of Georgia and

is subject to this Court's jurisdiction.  He may be served with process via personal

service at his place of business: Fulton County Office of the County Attorney, 141

Pryor Street, SW, Atlanta, Georgia 30303.

7.     Defendant Fulton County is a county of the State of Georgia that lies

within the Northern District of Georgia and is subject to this Court's jurisdiction.

The County may be served with process via personal service upon the Chairman of

the Fulton County Board of Commissioners, Chairman John Eaves, at 141 Pryor

Street, SW, Atlanta, Georgia 30303.

## FACTUAL ALLEGATIONS

8.     Defendant Ware was appointed to the office of Fulton County

Attorney in November 2008.

9.     As County Attorney, Ware is the County's highest legal officer.  He is

the highest County official responsible for providing legal advice to the County

Commission and to County officials concerning, among other topics, federal laws prohibiting discrimination, harassment, and retaliation in the workplace. He is also the highest County official responsible for representing the County when employees make claims under these laws.

10.     As County Attorney, Ware is the County's highest official with authority to hire, fire, discipline, and take other personnel actions affecting the attorneys, paralegals, assistants, and other employees of the Fulton County Attorney's Office. The County Commission has fully delegated to Ware, as County Attorney, the ultimate authority to make such personnel decisions.

## Dionne Dixon

11.     Dixon began working for the Fulton County Attorney's office as a paralegal in October 2008, about a month before Ware became the Fulton County Attorney.

12.     In or about November 2009, Ware began coming in to Dionne's office without any business reason for doing so.

13.     Ware would tell Dixon that he could not trust her yet and that he needed to know whether he could trust her.

14.     In early 2010, Ware began telling Dixon that he wanted to talk with her after 5:30 in the evening.

4

15.     Dixon declined Ware's invitations.

16.     In or about the middle of 2010, Ware began expressly pressuring Dionne Dixon for sex.

17.     On multiple occasions, Ware told her that he and she could have sex on the couch in his office.  Ware often added that, since he was the boss, he could just lock his office door and no one would ever know.

18.      Dixon rejected Ware's advances each time he made them and, on several of these occasions, she also told him that she was involved in a relationship already.

19.     None of this deterred Ware.

20.     Ware made sexual comments about Dionne's appearance, telling her things like, "You don't know what you do to me when you wear that dress" or "You do it to me in that dress."

21.     On one occasion, Ware leered at Dixon in a conference room while telling her that she was turning him on by being in the dress she was wearing.

22.     On some of the occasions on which Ware made these kinds of comments about Dixon's appearance, he made suggestive facial expressions and hand gestures.

23.     Ware, who was married, complained to Dixon repeatedly about how long it had been since he had had sex.  He would follow up these comments by telling her that, if he could get sex, he would not need Viagra.

24.     On one occasion, Ware approached Dixon and told her that he had almost come up behind her and grabbed both of her breasts but that she had turned around too quickly.

25.     On another occasion, he told Dixon that he wanted to rub her legs because they looked sexy.

26.     Ware pressured Dixon to move her office closer to his, but she declined.  When Ware learned of her decision, he told her that he was disappointed because he had wanted her to be closer to him so that he could spend more time with her.

27.     Ware repeatedly asked Dixon whether she had ever had sex with her former supervisor, Fulton County District Attorney Paul Howard.  Ware told Dixon on these occasions that he did not understand why Mr. Howard was able to get women in his office to sleep with him while he, Ware, could not.

28.     On another occasion, after the conclusion of a trial in the U.S District Court for the Northern District of Georgia, Ware told Dixon that she looked good and sexy.   Ware accentuated these comment by making suggestive expressions

and noises.  Ware asked Dixon why she had not come to his office lately, and she explained that she had been busy working on the trial.  Ware then told Dixon, "I don't want you to say that I'm sexually harassing you," or words to that effect, and then asked her to come to his office soon anyway.

29.    In July 2011, Dixon told Ware that she was pregnant.

30.    He responded with intrusive personal questions about the father's identity, Dixon's relationship with the father, and Dixon's financial status.

31.    Ware asked Dixon if she was going to have an abortion and told her that he does not believe in abortion.

32.    Dixon excused herself from the conversation, but Ware approached her on several later occasions to ask her similar questions.

33.    In mid-July 2011, Dixon advised Helen Barrow, the office manager, that she was experiencing pregnancy-related medical complications and that she would need to begin winding down her work in preparation for taking medical and pregnancy leave.

34.    In late July 2011, Dixon went into premature labor and received related medical treatment.

35.    Dixon completed leave paperwork, submitted it to Barrow, and began leave on or about July 28, 2011.

36.     On December 7, 2011, Dixon returned to work and gave Ware a note from her doctor.  The note stated that, due to circumstances surrounding her job, the doctor was "reluctantly" releasing Dixon to return to work on that day rather than on January 4, 2012, as he preferred.

37.     After reading the doctor's letter, Ware told Dixon that a new paralegal had been given Dixon's office and that they had moved Dixon's belongings into a new office closer to his.

38.     Ware then told Dixon that he objected to her doctor's language about her job status and his reluctance to release her to work.  Ware directed Dixon to have her doctor redraft the letter to remove the language.  Dixon said she would comply with this order.

39.     Later that morning, Ware told Dixon to go home and said that he would let her know when she could return to the office.   Dixon told Ware that she would have the doctor rewrite the letter and that she would bring it back to him, but Ware rejected this, telling her to have the doctor fax it to him and that he would determine whether she could return.

40.     The next morning, December 8, 2011, Dixon sent Ware an email stating that her doctor had redrafted the release letter.  In her email, Dixon asked

Ware for his direct fax number so that she could ensure her privacy by sending the letter directly to Ware, rather than using the office's public fax line.

41.     She also asked "Please let me know as soon as possible when I can return back to work."

42.     Ware did not immediately respond, so at 3:00 p.m. the same day, Dixon sent a follow up email again stating that the release letter was ready to be faxed by her doctor and requesting Ware's direct fax number.

43.     The same day, Dixon received a letter from Ware summarily terminating her employment effective at the close of business.

44.     Ware terminated Dixon because she would not acquiesce to his sexual demands.

45.     Additionally and in the alternative, Ware terminated Dixon because she had opposed his unlawful sexual harassment by telling Ware, who was both the harasser and the highest official in her department, to stop his sexual advances.

## Tonya Fortune

46.     Fortune began her employment with the County Attorney's Office on February 4, 2009.

47.     She held the position of Administrative Coordinator II, and she was Ware's executive assistant.

48.     On multiple occasions, Ware told Fortune that she needed someone to take care of her and that her fiancé was not capable of doing that.

49.     Ware also told Fortune that he was having marital issues and that he needed someone to confide in.  He asked her if she had noticed that he had not been wearing his wedding ring.

50.     In April 2010, Fortune told an official in the County's Office of Equal Employment Opportunity ("OEEO") that Ware had been making unwanted sexual advances toward her and that she wished to discuss how to file an internal charge of discrimination or harassment.

51.     The OEEO official dissuaded Fortune from making a formal complaint, telling her that filing a complaint against Ware would be like "David and Goliath."

52.     The County took no investigative or remedial action.

53.     Ware told Fortune on multiple occasions that County Manager Zachary Williams was attracted to her and also that Ralph Daniels, the chief of staff for County Commissioner Thomas Lowe, was attracted to her.

54.     On other occasions, Ware told Fortune that she was a "five star chick," a reference to a rap song with explicit and derogatory sexual lyrics about women.

55.     On, at minimum, a weekly basis, Ware commented on Fortune's appearance.  On these occasions, Ware would tell Fortune that he thought she had nice, long legs; that she should wear dresses more often; and other, similar words, which Ware spoke in a sexually suggestive manner.

56.      Ware claimed to Fortune that Zina Miller, Executive Assistant to the County Manager, had told him she had had an orgasm because one of Ware's letters to an opposing lawyer was so well written.

57.     Ware told Fortune that one of the attorneys in the office, Plaintiff Wanda Dallas, wanted to have sex with him but that he did not like dark-skinned women.  Instead, Ware explained, he liked "red-boned" women like Fortune.

58.     Ware added that Dallas had so much going on in her life that she needed a man to "hit it good every now and then to knock the edge off of her sometimes."

59.     On or about July 28, 2010, Ware came into Fortune's office and closed the door.

60.     He told her that he was attracted to her.

61.     He also told her that he knew she was soon going to begin a previously scheduled medical leave in order to have surgery.

11

62.     Ware said that if she were willing to have an affair with him, he understood what his financial responsibilities to her would be.  Ware said that he knew Fortune's fiancé was not in a position to help her financially but that he would be able to.

63.     Ware quickly added that they could not let anyone know that he was having an affair with her because he had too much to lose.

64.     Fortune told Ware that she was not interested in having a relationship with him.

65.     Fortune was out on medical leave until September 29, 2011.

66.     On the morning that she returned to work, Ware told her that he had missed her but that he was over her now.

67.     When Fortune returned to work, she was not yet completely recovered from her surgery, and her doctor restricted her no more than five hours' work per day.  Fortune gave the office manager a letter from her doctor to this effect.

68.     Despite the doctor's medical restrictions, Ware required Fortune to work six or more hours per day in order to keep up with her workload.

69.     Fortune told the same OEEO official to whom she had previously complained about Ware's sexual harassment about this situation.

70.     Soon after her return to work, Ware began to scrutinize and nitpick Fortune's work more harshly than he had before and more harshly than he scrutinized the work of subordinates who had not rejected his sexual advances.

71.     As a result of this untenable working situation and the failure of County human resources to act in response to her complaints, Fortune was left with no other practicable option, and on December 20, 2010, Fortune handed Ware her resignation letter.

72.     Ware said that he understood Fortune's reasons for leaving.  He then asked whether she was going to sue him.

73.     He claimed that one of his female colleagues at his previous law firm had come into his office, taken off all of her clothes, and tried to seduce him but that he was not interested and he had rejected her.   Ware said that this colleague had continued asking him after the incident if he was going to tell the partners of the firm and whether he was going to sue her.

74.     Ware then told Fortune that he had been attracted to her from the first time he met her and had interviewed her.

**Wanda Dallas**

75.     Dallas began working for the Fulton County Attorney's office in October 2009 in the position of staff attorney.

76.    Ware, knowing that Dallas was a religious woman and active in her church, approached her within a few weeks of hiring her and told her that he was active in his church as an assistant pastor.

77.    He told her that there was an "at-work David" and an "after-hours David," and that if she ever needed to talk to him or confide in him she could trust him.

78.    As Ware also knew, Dallas had only recently lost her mother to lung cancer, and her marriage of 23 years had just ended in divorce, leaving Dallas to cope not only with her mother's death, but with suddenly being the single mother of five children.

79.    In November or December 2009, Ware, during an otherwise routine meeting about one of Dallas' cases, told her that he was tired of men approaching him about her.

80.    Ware said there were a few men who were interested in Dallas, but he knew that she was "not ready," so he was not going to tell her who they were.

81.    Dallas did not inquire about any details because she was not interested.

82.    Later in 2009, Ware began telling Dallas that he was having marital problems.  He told Dallas that, despite the marital problems he was having, he had

decided to put his wedding band back on because she was not ready.  He said this to her on multiple occasions in late 2009 and early 2010.  Ware also continued telling Dallas that there were men who were interested in her and were asking him about her.  Dallas never asked about any details or expressed any interest.

83.   In the spring of 2010, Ware told Dallas there was really only one man who was interested in her and that man was him.  He told her that he was attracted to her.   Dallas gave him no response and walked away from the conversation.

84.   After this, Dallas began trying to avoid Ware to the extent that she could, but then he began coming to her office more and more to seek her out.

85.   Despite Dallas's efforts to avoid him, Ware repeatedly made suggestive or promiscuous comments about Dallas's physical appearance during the remainder of her employment with the County Attorney's office..

86.   He also solicited her for sex or a physical relationship on several occasions over that period of time.

87.   In summer 2010, Chief Deputy Jimmy Carter of the Fulton County Sheriff's office approached Dallas about a job opportunity as counsel at the Sheriff's Office.  Dallas said that she was interested.  Chief Carter told Ware that the Sheriff's Office wished to hire Dallas.

88.   Ware continued his unwanted sexual advances toward Dallas.

15

89.     Not long after Dallas's conversation with Deputy Chief Carter, Ware approached Dallas after a staff meeting.  He told her that she made it hard for him to concentrate during the meeting because he could not stop looking at her neck and he wanted to bite her neck.

90.     Shortly after Ware made these comments, Dallas approached the head of her unit, Senior Attorney Steven Rosenberg, and another attorney in the office, Coy Johnson, and told them what Ware had said.

91.     Dallas also told Rosenberg and Johnson that Ware had been making sexual remarks to her for months and that she did not know what to do.  She also told them that Ware's behavior was inappropriate and that it was making her feel very uncomfortable.

92.     Rosenberg responded to this by putting his head in his hands and stating, "This guy's crazy" or words to that effect.

93.     To Dallas's knowledge, however, no investigative or remedial action was taken.

94.     In or about November 2010, Ware issued instructions that all attorneys in the office were relieved of their responsibility to handle tax appeals. Then, he assigned Dallas, alone, to handle tax appeals, without reducing any of her previously existing workload.

16

95.     Later in November or December 2010, Ware called Dallas into his office.  He pulled out a Post-It notepad.  Writing one word on each sheet of paper, tearing each sheet off the pad, holding up the sheets for Dallas to see one at a time, he wrote: "Are you interested in having a relationship with me?"  As he revealed the sheets spelling out this sentence, he nodded in the direction of the couch in his office.  Dallas again rejected his advance.

96.     In December 2010, the Sheriff's Office appeared to have finalized Dallas's new position as its in-house counsel.

97.     Dallas therefore went to Ware's office and gave him a two-week notice letter of her resignation.

98.     Ware looked at the letter and then asked Dallas, "Since you are not going to be working for me anymore, can we have a relationship?"  Dallas told him no.

99.     Ware then turned away from her and said, "Okay, then today is your last day."

**Governmental and Decision Maker Liability**

100.   Defendant Ware was, at all times material to this Complaint, the highest County official with authority to hire, fire, transfer, demote, promote, discipline, and take other personnel actions affecting employees of  the County

Attorney's Office, including the Plaintiffs.  The County Commission had fully

delegated to Ware the ultimate authority to make these decisions.

101.   Ware's above-pled employment actions were not subject to, and did

not require, higher review or approval.  His above-pled employment actions were

also not subject to appeal or reversal by any other official or entity.

102.   Defendant Ware was the County's final decision maker with respect

to each of the unlawful employment actions giving rise to this Complaint.

103.   Defendant Ware was the County's final policy maker with respect to

each of the unlawful employment actions giving rise to this Complaint.

104.   Defendant Ware undertook all of the unlawful conduct giving rise to

the Plaintiffs' claims while acting under color of state and local law.

105.   At all times material to this Complaint, it was clearly established law

that subjecting subordinates to sexual harassment or a sexually hostile working

environment based upon gender violates the Equal Protection Clause.

106.   At all times material to this Complaint, it was clearly established law

that a supervisor may not take an adverse employment action against a subordinate

because she rejects his sexual advances.

**Punitive Damages Allegations**

107.   Ware undertook all of the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to the Plaintiffs and their federally protected rights.

108.   Additionally and in the alternative, Ware undertook all of the above-pled conduct with reckless disregard for the Plaintiffs and their federally protected rights.

**COUNT I**
**Sexual Harassment/ Sexually Hostile Working Environment**
**In Violation of the Equal Protection Clause**
**(Actionable Under 42 U.S.C. § 1983)**

109.   Plaintiffs incorporate each of the above factual allegations as if fully restated here.

110.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles Plaintiffs to equal protection under the laws based upon gender.

111.   The Defendants violated the Plaintiffs' rights to equal protection by, among other things, subjecting them to a sexually harassing and hostile working environment, taking adverse employment actions against the Plaintiffs for their refusal to acquiesce to sexual advances, and by failing to take reasonable preventative or corrective measures with respect to the unlawful harassing conduct.

19

112.   The Defendants' conduct constitutes unlawful sexual harassment and an unlawful hostile working environment, based upon gender, in violation of the Equal Protection Clause.

113.   Additionally and in the alternative, the Defendants' unlawful conduct constitutes sexual harassment culminating in an ultimate employment action against the Plaintiffs.

114.   The Defendants undertook all of the unlawful conduct giving rise to the Plaintiffs' claims while acting under color of State and local law.

115.   Defendant Ware's unlawful conduct violated the above-pled clearly established law.

116.   As a direct and proximate result of the Defendants' actions, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

117.   Defendant Ware undertook his unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against him.

118.   Additionally and in the alternative, Defendant Ware undertook his unlawful conduct recklessly with respect to the Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against him.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

(a)     a declaratory judgment that the Defendants violated the Plaintiffs'
rights under the Equal Protection Clause;

(b)     an injunction prohibiting the Defendants from engaging in such
unconstitutional conduct in the future;

(c)     full back pay from the date of each Plaintiff's constructive or express
termination, taking into account all raises to which Plaintiffs would have been
entitled but for their unlawful terminations, and all fringe and pension benefits of
employment, with prejudgment interest thereon;

(d)     reinstatement of each Plaintiff to her former position with the County
or in the alternative, front pay to compensate Plaintiffs for their lost future wages,
benefits, and pension;

(e)     compensatory damages, in an amount to be determined by the
enlightened conscience of the jury, for Plaintiffs' emotional distress, suffering,
inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)     punitive damages, against Defendant Ware only, in an amount to be
determined by the enlightened conscience of the jury to be sufficient to punish

Ware for his conduct toward Plaintiffs and deter him from similar conduct in the future;

    (g)    reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    (h)    other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

s/ Steven E. Wolfe
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com
Cheryl B. Legare
Georgia Bar No. 038553
cblegare@buckleyklein.com
Steven E. Wolfe
Georgia Bar No. 142441
sewolfe@bckleyklein.com

BUCKLEY & KLEIN, LLP
Promenade II, Suite 900
1230 Peachtree Street, NE
Atlanta, GA  30309
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

Attorneys for Plaintiffs